IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

**STATE OF TENNESSEE v. JAVARIUS DESHAWN BAUGH**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-689     Steve R. Dozier, Judge**

_____

**No. M2019-01916-CCA-R3-CD**

_____

The Defendant, Javarius Deshawn Baugh, was convicted by a Davidson County Criminal Court jury of first-degree premeditated murder and unlawful possession of a firearm by a convicted felon, for which he received an effective sentence of life imprisonment in the Department of Correction. The sole issue he raises on appeal is whether the evidence was sufficient to establish his identity as the perpetrator of the crimes. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J. joined. THOMAS T. WOODALL, J., not participating.

Jay Umerley, Nashville, Tennessee, for the appellant, Javarius Deshawn Baugh.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a December 27, 2015 early morning shooting at a Nashville apartment complex that resulted in the death of Terry Stewart. The Defendant was developed as a suspect after a police officer stopped the vehicle in which the Defendant was riding as a passenger and found in the glove box a loaded Glock 20 handgun that matched shell casings recovered from the scene of the shooting. The driver of the vehicle

placed the Defendant at the apartment complex minutes after the gunshots were fired and the Defendant's cellphone contained videos and photographs of the Defendant with a semiautomatic weapon that appeared to be the gun found in the glove box. In addition, the Defendant was wearing similar clothing to that worn by the shooter in a surveillance video of the shooting. The Defendant was subsequently indicted for the first-degree premeditated murder of the victim and unlawful possession of a firearm by a convicted felon.

At the Defendant's February 25-36, 2019 trial, Renita Stewart, the victim's mother, testified that the victim was thirty years old at the time of his death and lived with his girlfriend at the Buena Vista Apartments.

Sergeant Richard Huddleston of the Metro Nashville Police Department, the first officer on the scene, testified that he was within five minutes of the apartment complex reviewing pending calls when he noticed a 911 hang up call that originated from the complex. He, therefore, headed to that location. En route, he received notice from dispatch that shots had reportedly been fired. Two vehicles were accelerating out of the complex as he pulled in. He went to the area of the 911 hang up call but saw no one. By that time, other officers had arrived, and he and fellow officers went to a second location where someone was reported to be in front of a door. There, they found the wounded victim slumped in front of a doorway.

Sergeant Huddleston testified that the driver of one of the two vehicles that he passed when he arrived at the complex later returned to the scene to speak with detectives. His understanding was that the individuals in that vehicle were random bystanders and not suspects.

Officer Peter Finnegan of the Metro Nashville Police Department testified that he arrived at the apartment complex at 1:25 a.m. to find the heavily bleeding and obviously mortally wounded victim slumped over the front stairs to an apartment unit. He said he repeatedly asked the victim who had shot him, but the victim was unable to talk.

Officer Justin Cregan of the Metro Nashville Police Department's Crime Scene Unit identified photographs of what he referred to as the primary crime scene, which was the porch area where the victim was found and the adjacent parking lot, and the secondary crime scene, which was the playground area of the complex. Among the evidence collected from the primary crime scene were the victim's cell phone, the victim's clothing, and a spent projectile. Among the items collected from the secondary crime scene were seven Winchester cartridge casings, the back cover to a cell phone, and a plastic baggie containing a white powdery substance.

Sharon Tilley, a forensic scientist civilian employee of the Metro Nashville Police Department's crime laboratory, who was assigned to the crime scene investigation unit at the time of the shooting, identified the diagram she had prepared of the scene, which showed where the various items of evidence were found.

Detective Ryan Koslowski of the Metro Nashville Police Department, who was a patrol officer at the time of the shooting, testified that at approximately 1:45 a.m. on December 27, 2015, he stopped the driver-owner of a white Buick, Rodricous Garrett, for failure to stop at a red light at the intersection of Brick Church and Ewing. After obtaining Mr. Garrett's permission to search the vehicle, he found a loaded Glock 20 handgun and a box of .40-caliber Winchester ammunition in the glove box. He identified the Defendant as the vehicle's front seat passenger and said that the Defendant was obviously agitated when he stopped the vehicle, leaning toward the driver's seat and attempting to interject himself into his conversation with Mr. Garrett. Detective Koslowski, therefore, had Mr. Garrett exit and walk to the rear of the vehicle. Shortly after he obtained Mr. Garrett's permission to search the vehicle, the Defendant climbed out of the vehicle through the driver's door and joined him and Mr. Garrett at the rear of the vehicle. The Defendant was visibly uncomfortable and kept protesting that Detective Koslowski did not have the right to search the vehicle.

Detective Koslowski testified that Mr. Garrett appeared surprised at his discovery of the gun in his vehicle. Neither man admitted ownership but because both were convicted felons, he arrested both men for unlawful possession of a firearm. When he questioned Mr. Garrett about the gun, Mr. Garrett claimed he had not known of its existence and made statements about what had just happened at the Buena Vista Apartments, where he had picked up the Defendant. Mr. Garrett's girlfriend, Ms. Rucker, corroborated Mr. Garrett's statements when she arrived to take possession of the vehicle. Detective Koslowski explained that because his precinct used a different radio channel from the channel used by the North Precinct where the apartment complex was located, he was unaware of the shooting until he called the North Precinct to verify the information. He recalled that the Defendant had a cell phone on his person but that he kept expressing concern about a second cell phone he had left in Mr. Garrett's vehicle. He stated that the Defendant wanted Ms. Rucker to take possession of that second cell phone, but it was instead transported with the Defendant and the rest of the Defendant's belongings to the North Precinct.

On cross-examination, Detective Koslowski testified that the distance from the Buena Vista Apartments to the location of the traffic stop was between four or five miles. He said he first saw the vehicle at 1:45 a.m. and stopped the vehicle at approximately 1:47 a.m. but wrote 1:50 a.m. in his report because he was "rounding up." He acknowledged that the Defendant appeared to be under the influence of an intoxicant. He agreed that Mr.

Garrett could have reached the glove box from the driver's seat. He further agreed that he found a few marijuana "roaches" in the vehicle, including some in the trunk.

Rodricous Garrett, who acknowledged he had a conviction for aggravated robbery, testified that he spent the night of December 26-27, 2015, with his son and his son's mother, Sabria Rucker, at Ms. Rucker's Buena Vista apartment. He said he was working at that time at Standard Candy and had to be at work for the 3:00 a.m. shift. He stated that he went outside that morning, started his vehicle to let it warm up, and went back inside to get ready to go to work. While inside, he heard gunshots. After waiting approximately five minutes to be sure he did not hear any sirens, he went back outside and got into his car to head to work. As he was pulling out of the parking lot, the Defendant, whom he knew casually from the neighborhood, stopped him and asked if he would give him a ride so that he could get away from the area of the shooting, and he agreed.

Mr. Garrett testified that he did not have a gun in his vehicle. He said the Defendant got into the passenger seat and gave him directions to the home of one of the Defendant's family members. During the drive, the Defendant was on the phone with a relative and learned he could not stay at the home, so he asked Mr. Garrett to take him somewhere else. En route to that second location, they were pulled over. After being reminded of what he told detectives at the time, Mr. Garrett recalled that he also stopped with the Defendant at a service station/convenience store, where he (Mr. Garrett) went inside to buy a cigar. He did not recall having told the officer that he overheard the Defendant on the phone with his sister telling her that "he needed to lay low." He agreed, however, that he would not have relayed that to the officer if it had not been true.

Mr. Garrett testified that when the officer learned his license was suspended, he asked him to step out of the vehicle, searched him, and asked for his permission to search the vehicle. He said the Defendant got out of the vehicle when he gave the officer his consent and asked why the officer wanted to search the vehicle. He stated that the officer told the Defendant that he looked intoxicated, placed both the Defendant and Mr. Garrett in handcuffs, and began searching the vehicle. He said he had no idea there was a gun in the vehicle. Had he known, he would have never given the officer consent to search because he knew it would create problems for him as a convicted felon.

Mr. Garrett testified that the officer also found a cell phone and some marijuana "roaches" in the vehicle and that he ultimately pled guilty to possession of the marijuana. He said the cell phone was not his or Ms. Rucker's, but when Ms. Rucker arrived to take possession of his vehicle, the Defendant asked her whether the cell phone was hers.

On cross-examination, Mr. Garrett acknowledged that his car was unlocked during the time he left it running while he went inside Ms. Rucker's apartment to get ready for

work. He agreed that the Defendant was intoxicated that night and that he might have described him to the detectives as "stumbling drunk." He acknowledged that he never saw the Defendant with a gun, but he adamantly denied that the gun was his, insisting that he would not "set [any]body up." On redirect examination, he reiterated that the marijuana roaches were his but the gun and the box of ammunition were not. He denied any involvement in the victim's murder.

Detective Anthony Heil of the Metro Nashville Police Department's surveillance and investigative support unit, who was accepted as an expert in the field of digital forensic analysis, testified at great length about the data he was able to extract from the two cellphones associated with the Defendant. He identified various images extracted from the phones, which were admitted as trial exhibits, including multiple photographs and a zip drive containing five videos. On cross-examination, he acknowledged that all the photographs and videos had a creation date prior to December 27, 2015. He did not believe that either phone was missing its back cover.

Detective Andrew Chouanard of the Metro Nashville Police Department, who was the lead detective assigned to the case, testified that the white powder found in the plastic baggie was Tylenol packaged in a manner to make it appear to be narcotics. He said investigators were unable to lift any fingerprints from the baggie or from the gun and box of ammunition found in Mr. Garrett's vehicle. He identified a video of portions of his interview with Mr. Garrett, which was admitted as an exhibit and published to the jury. He also identified surveillance footage of the shooting that showed various camera angles of the complex. He explained significant portions of the surveillance video as it was played for the jury, identifying from one camera angle Mr. Garrett's vehicle, which left the complex at 1:27 a.m.; from a different camera or angle a figure that came from the back of the complex and fired a gun at approximately 1:23 a.m.; and from yet a different angle, and at approximately the same time that the gunshots were fired, a figure running from the playground area toward the area where the victim was found.

Detective Chouanard identified a figure in a still frame from the video as the shooter and testified that the figure was wearing an orange hat and possibly a "medium toned shirt." He also identified photographs that were taken of the Defendant at the North Precinct later on the morning of the shooting, which showed the Defendant in similar clothing. He testified that the material obtained from the two cellphones was consistent with the phones being possessed by the Defendant. He identified a photograph of the Defendant sitting on the back of a car and testified that it appeared to have been taken on December 26, 2015, at 2:09 p.m. at the Buena Vista Apartments. He also identified the videos extracted from the phones, some of which showed the Defendant holding a black gun that appeared consistent with the murder weapon. He testified that in one of the videos, the Defendant identified the weapon as a Glock 22 but that it could have been a Glock 20 that the

Defendant mistakenly identified as a Glock 22. He explained that a Glock 20, which looks very similar to a Glock 22, is capable of firing a .40-caliber cartridge, although it is designed to fire a 10-millimeter cartridge, whereas the Glock 22 is the gun designed to fire a .40-caliber cartridge. On cross-examination, he acknowledged that no DNA matching the Defendant was found on the gun, the cartridges, or the box of ammunition.

Dr. David Zimmerman, the Davidson County assistant medical examiner who performed the autopsy of the victim's body, testified that the victim died of a gunshot wound in which the bullet entered his body at the left buttock, fractured the left pelvis, passed through the skeletal muscle of the pelvic cavity, the small intestines, the colon, and the intestinal mesentery, and exited the body on the right side of the abdomen.

Ryan Kent, supervisor of the firearm and tool mark identification unit of the Metro Nashville Police Department Crime Laboratory and a firearms and tool mark identification expert, testified that he determined that the seven Winchester cartridge casings recovered from the crime scene had been fired by the Glock model 20 weapon that was submitted for analysis. He also explained the minor differences between the Glock 20 and Glock 22 weapons, consistent with the earlier testimony by Detective Chouanard. On cross-examination, he confirmed that he had been unable to determine whether the bullet and bullet fragment that had been recovered from the crime scene had been fired from the weapon.

The parties stipulated that the Defendant "had been convicted of a felony involving the use of or attempted use of force, violence, or a deadly weapon prior to December 27, 2015."

The Defendant elected not to testify and rested his case without presenting any witnesses. Following deliberations, the jury convicted him of both counts as charged in the indictment. This appeal followed.

## ANALYSIS

The only issue the Defendant raises on appeal is whether the evidence is sufficient to sustain the convictions. Specifically, he argues that the proof was insufficient for the jury to find beyond a reasonable doubt his identity as the perpetrator of the crimes. In support, he cites, among other things, the lack of any DNA or fingerprint evidence linking him to the crimes, Mr. Garrett's motivation to lie as a convicted felon, and the fact that the murder weapon was a Glock 22 instead of the Glock 20 that the Defendant identified as his weapon in one of his cell phone videos. The State responds that the evidence was sufficient to establish the Defendant's identity as the perpetrator beyond a reasonable doubt. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"The identity of the perpetrator is an essential element of all crimes and may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

We conclude that the evidence was sufficient to establish the Defendant's identity as the man who shot and killed the victim with the Glock 22 weapon that was later recovered from Mr. Garrett's vehicle. Viewed in the light most favorable to the State, the evidence established that within a few minutes of the shooting, Mr. Garrett picked up the Defendant from the apartment complex. The Defendant, who wore similar clothing to that worn by the shooter in the surveillance videotape, was anxious to get away from the scene and told his sister during a telephone call of his need to "lay low." The Defendant appeared very uncomfortable when an officer pulled Mr. Garrett over and expressed great concern at Mr. Garrett's having given consent for the officer to search the vehicle. Inside the glove compartment, located directly in front of where the Defendant had been sitting, was a gun that appeared to be the same as one that the Defendant was holding in multiple photographs and videos that were recovered from his cell phone. A firearms expert determined that spent shell casings found at the crime scene had come from that weapon, and Mr. Garrett, who adamantly denied knowledge of the gun, acknowledged during his testimony that he

had left the vehicle to purchase a cigar from a store during the time he was giving the Defendant a ride from the complex. Finally, although the Defendant identified his weapon in his cellphone video as a Glock 20, both the firearms expert and the police detective explained that the two models appear almost the same and that an uneducated lay person could easily get them confused. From all this evidence, a rational jury could reasonably conclude that the Defendant was the man who fired multiple gunshots at the victim, causing the victim's death. We conclude, therefore, that the evidence is sufficient to sustain the Defendant's convictions for first degree premeditated murder and unlawful possession of a firearm by a convicted felon.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE